IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

PAULA BUNGART,                        )
                                      )
              Plaintiff,              )
                                      )
       v.                             )      Case No.
                                      )      14-4128-CV-C-REL-SSA
CAROLYN W. COLVIN, Acting             )
Commissioner of Social Security,      )
                                      )
              Defendant.              )

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Paula Bungart seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). I find that the ALJ's opinion is not supported by substantial evidence in the record as a whole. Therefore, plaintiff's motion for summary judgment will be granted and the decision of the Commissioner will be reversed.

## I.   BACKGROUND

On March 28, 2012, plaintiff applied for disability benefits alleging that she had been disabled since January 1, 2009. Plaintiff's application was denied on May 3, 2012. On May 1, 2013, a hearing was held before an Administrative Law Judge. On May 30, 2013, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On March 14, 2014, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because

2

substantial evidence would have supported an opposite decision." Id.; Clarke v.

Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.   BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

3

2.  Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.  Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.  Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.  Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.   THE RECORD

The record consists of the testimony of plaintiff and vocational expert Denise

Weaver, in addition to documentary evidence admitted at the hearing.

## A.   EARNINGS RECORD

The record shows that plaintiff earned the following income from 1972 through

2013:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1972 | $ 358.00 | 1993 | $ 3,764.47 |
| 1973 | 144.98 | 1994 | 6,732.50 |
| 1974 | 2,235.58 | 1995 | 2,833.08 |
| 1975 | 1,226.45 | 1996 | 3,002.68 |

4

| | | | |
|---|---|---|---|
| 1976 | 4,426.30 | 1997 | 4,041.76 |
| 1977 | 417.00 | 1998 | 4,550.10 |
| 1978 | 687.43 | 1999 | 10,053.09 |
| 1979 | 625.00 | 2000 | 11,262.39 |
| 1980 | 0.00 | 2001 | 16,232.30 |
| 1981 | 2,233.60 | 2002 | 18,066.01 |
| 1982 | 2,115.51 | 2003 | 7,912.44 |
| 1983 | 0.00 | 2004 | 7,497.35 |
| 1984 | 0.00 | 2005 | 5,040.91 |
| 1985 | 0.00 | 2006 | 0.00 |
| 1986 | 90.00 | 2007 | 1,787.98 |
| 1987 | 0.00 | 2008 | 638.26 |
| 1988 | 0.00 | 2009 | 0.00 |
| 1989 | 310.40 | 2010 | 3,274.21 |
| 1990 | 1,590.36 | 2011 | 1,491.56 |
| 1991 | 4,299.70 | 2012 | 0.00 |
| 1992 | 448.00 | 2013 | 0.00 |

(Tr. at 244-245, 264).

**B.    SUMMARY OF MEDICAL RECORDS**

Because the dispositive issue in this case is plaintiff's migraine headaches, I have limited my summary of the medical records to this area.

5

On October 2, 2008, plaintiff had a sonographic evaluation of the carotid systems due to complaints of headaches (Tr. at 342, 649, 655). She had stenosis (narrowing) in the mid left internal carotid artery. Plaintiff was notified by her treating physician, Dustin Warbritton, D.O., of this blockage on October 8, 2008 (Tr. at 441). Two days earlier he had refilled her Darvocet (narcotic), 60 pills with one refill (Tr. at 442).

On November 21, 2008, Dr. Warbritton refilled plaintiff's Darvocet (narcotic), 60 pills with one refill (Tr. at 436).

On December 1, 2008, Dr. Warbritton refilled plaintiff's Ativan,[1] 60 pills with one refill (Tr. at 435).

On December 10, 2008, plaintiff saw Dr. Warbritton complaining of daily headaches (Tr. at 433-434). Dr. Warbritton diagnosed migraine (Tr. at 433). He prescribed Imitrex.

On January 9, 2009, Dr. Warbritton refilled plaintiff's Imitrex, 9 treatments with one refill (Tr. at 432, 801).

On January 21, 2009, Dr. Warbritton refilled plaintiff's Darvocet (narcotic), 60 pills with one refill (Tr. at 431, 800).

On March 4, 2009, Dr. Warbritton refilled plaintiff's Ativan, 60 pills with one refill (Tr. at 430, 799).

---

[1]Ativan treats anxiety. Dr. Warbritton stated in his Medical Source Statement that anxiety "very much" contributed to plaintiff's migraine headaches (Tr. at 813).

6

On March 23, 2009, Dr. Warbritton refilled plaintiff's Darvocet (narcotic), 60 pills with one refill (Tr. at 429, 798).

On April 29, 2009, Dr. Warbritton prescribed Darvocet (narcotic), 60 pills with one refill (Tr. at 425, 794).

On May 12, 2009, Dr. Warbritton refilled plaintiff's Ativan, 60 pills with one refill (Tr. at 424, 793).

On May 27, 2009, plaintiff saw Dr. Warbritton and was found to have muscle spasm in the back of her neck (Tr. at 420-422, 789-791). She was experiencing nausea and vomiting. Plaintiff was prescribed Darvocet (narcotic) with one refill; Imitrex, 9 doses with one refill; Ativan, 60 pills with one refill, and was told to continue over-the-counter Excedrin as well.

On July 1, 2009, Dr. Warbritton refilled plaintiff's Imitrex, 9 doses with one refill (Tr. at 413, 782).

On July 10, 2009, Dr. Warbritton refilled plaintiff's Ativan, 60 pills with no refills (Tr. at 411, 780).

On September 15, 20090, Dr. Warbritton refilled plaintiff's Ativan, 60 pills with no refills (Tr. at 410, 779).

On October 19, 2009, Dr. Warbritton refilled plaintiff's Ativan with no refills (Tr. at 409, 777-778).

On October 29, 2009, Dr. Warbritton refilled plaintiff's Ativan, 60 pills with one refill (Tr. at 408).

On February 2, 2010, Dr. Warbritton refilled plaintiff's Ativan, 90 pills (Tr. at 401, 770).

On March 26, 2010, Dr. Warbritton refilled plaintiff's Ativan, 90 pills with two refills (Tr. at 396, 765).

On April 20, 2010, plaintiff went to the emergency room complaining of a migraine headache with nausea (Tr. at 618-620). Plaintiff was given an injection of Toradol (non-steroidal anti-inflammatory), Reglan (treats nausea and vomiting), Demerol (narcotic) and Phenergan (treats nausea). Her pain subsided and she was discharged.

On June 17, 2010, Dr. Warbritton refilled plaintiff's Ativan, 90 pills with one refill (Tr. at 393, 762).

On August 3, 2010, Dr. Warbritton refilled plaintiff's Ativan, 90 pills with two refills (Tr. at 392, 761).

On September 29, 2010, plaintiff saw Dr. Warbritton for low back pain and muscle spasm in the back of her neck (Tr. at 389-391, 758-760). Plaintiff rated her pain a 5 out of 10. Osteopathic manipulative treatment was performed, and plaintiff's medications were continued.

On October 18, 2010, Dr. Warbritton prescribed Ultracet (a narcotic-like pain reliever) and Norflex (muscle relaxer) after plaintiff complained of neck pain (Tr. at 388, 757).

On November 2, 2010, Dr. Warbritton refilled plaintiff's Ativan, 90 pills with two refills (Tr. at 387, 756).

On November 7, 2010, plaintiff went to the emergency room due to headache with nausea and blurred vision (Tr. at 608-611). "Patient believes her neck is the source of why she is having the headache." She had tenderness to palpation on the left side of the back of her neck. She was given Toradol (non-steroidal anti-inflammatory) and Norflex (muscle relaxer) by injection. She was told to follow up with Dr. Warbritton for osteopathic manipulation.

On November 9, 2010, plaintiff saw Dr. Warbritton complaining of a headache (Tr. at 384-386, 753-755). She was found to have muscle spasms in the back of her neck. She was assessed with a headache at the base of her skull. Osteopathic manipulative therapy was performed, and plaintiff's Flexeril was refilled.

On November 17, 2010, plaintiff called Dr. Warbritton and reported that she was still having pain in the back of her neck (Tr. at 383, 752). An appointment was scheduled for November 22.

On November 22, 2010, plaintiff saw Dr. Warbritton for a headache (Tr. at 380-382, 749-751). She rated her pain a 6 out of 10. Plaintiff had muscle spasms in the back of her neck. Osteopathic manipulative therapy was performed and plaintiff's medications were continued.

On December 6, 2010, Dr. Warbritton refilled plaintiff's Ultram, 60 pills with two refills, and Zanaflex (muscle relaxer), 30 pills with two refills (Tr. at 748).

On December 10, 2010, plaintiff saw Jeanne Naeger, RN, in Dr. Warbritton's office (Tr. at 376-377, 745-747). Plaintiff was assessed with sinus infection and headache. Her Ultram and Zanaflex were refilled, each with two refills.

9

On December 20, 2010, Dr. Warbritton refilled plaintiff's Zanaflex, 180 pills (Tr. at 374, 743).

On January 25, 2011, Dr. Warbritton refilled plaintiff's Ativan, 90 pills with one refill (Tr. at 372, 741).

On January 31, 2011, Dr. Warbritton refilled plaintiff's Ultracet, 60 pills with three refills (Tr. at 371, 740).

On February 15, 2011, plaintiff saw Dr. Warbritton for back pain and muscle spasm in the back of her neck (Tr. at 368-370, 737-739).  She rated her pain a 7 out of 10.  Osteopathic manipulative treatment was performed, and plaintiff was told to continue with her medication.

On March 9, 2011, Dr. Warbritton refilled plaintiff's Zanaflex, 180 pills with one refill (Tr. at 367, 736).

On April 18, 2011, Dr. Warbritton refilled plaintiff's Ativan, 90 pills with one refill (Tr. at 366, 735).

On April 28, 2011, Dr. Warbritton refilled plaintiff's Ultracet with two refills (Tr. at 365, 734).

On May 3, 2011, plaintiff saw Dr. Warbritton for low back pain and muscle spasm in the back of her neck (Tr. at 362-364, 731-733).  She reported headaches.  She rated her pain a 7 out of 10 on this day, and she said it had been 10 out of 10 the past weekend.  Osteopathic manipulative treatment was performed, and plaintiff was told to continue her medications which included Ultracet, Zanaflex, Ativan, and Excedrin.

Case 2:14-cv-04128-REL   Document 20   Filed 05/29/15   Page 10 of 26

On May 13, 2011, plaintiff saw Dr. Warbritton for low back pain and muscle spasm in the back of her neck (Tr. at 358-360, 727-728). Plaintiff was currently using Ultracet, Zanaflex, Vicodin (narcotic), Ativan, and over-the-counter Excedrin. Osteopathic manipulative treatment was performed. Plaintiff was assessed with low back pain and muscle spasm in the back of her neck. Her medications were continued.

On May 25, 2011, Dr. Warbritton refilled plaintiff's Vicodin (narcotic), 90 pills, with two refills (Tr. at 356, 725).

On July 13, 2011, plaintiff saw Dr. Warbritton for muscle spasm in the back of her neck and pain in her hips and back (Tr. at 354-355, 722-723). Plaintiff weighed 158.8 pounds. X-rays were ordered.

On July 14, 2011, plaintiff saw Dr. Warbritton for back pain (Tr. at 352-353). She was assessed with low back pain and muscle spasm in the back of her neck. She was prescribed Norco (narcotic), Flexeril, and Ativan.

On August 8, 2011, Dr. Warbritton refilled plaintiff's Flexeril, 60 pills with one refill (Tr. at 720).

On August 15, 2011, Dr. Warbritton refilled plaintiff's Norco (narcotic), 120 pills with two refills (Tr. at 719).

On August 29, 2011, Dr. Warbritton refilled plaintiff's Ativan, 90 pills (Tr. at 716).

On September 2, 2011, Dr. Warbritton refilled plaintiff's Zanaflex, 180 pills (Tr. at 715).

On September 30, 2011, plaintiff saw Dr. Warbritton for back pain and headache which had been present for the "last few days" (Tr. at 500-502). Dr. Warbritton

11

performed osteopathic manipulative treatment and prescribed Zanaflex, Ativan, Flexeril and Norco (narcotic).

On October 7, 2011, Dr. Warbritton refilled plaintiff's Ativan, 90 pills (Tr. at 647, 711).

On October 12, 2011, Dr. Warbritton refilled plaintiff's Norco (narcotic), 180 tablets (Tr. at 646, 709).

On October 21, 2011, plaintiff saw Dr. Warbritton and complained of headache (Tr. at 712-713). Dr. Warbritton performed osteopathic manipulation and continued plaintiff's medications.

On November 21, 2011, Dr. Warbritton refilled plaintiff's Ativan, 90 pills (Tr. at 645, 710).

On November 28, 2011, Dr. Warbritton refilled plaintiff's Norco (narcotic), 120 pills, and her Zanaflex, 180 pills (Tr. at 708).

On December 9, 2011, plaintiff saw Dr. Warbritton who observed muscle spasm in plaintiff's neck (Tr. at 642-643). He performed osteopathic manipulation and continued her on her same medications.

On December 21,2011, plaintiff saw Dr. Warbritton who assessed headache (Tr. at 638-641, 701). He performed osteopathic manipulative therapy and refilled plaintiff's Ativan, 90 tables with one refill, and her Norco (narcotic), 120 pills with one refill.

On January 20, 2012, plaintiff saw Dr. Warbritton who observed muscle spasm in the back of her neck (Tr. at 703-704). He performed osteopathic manipulation and continued her on the same medications.

On January 24, 2012, Dr. Warbritton told his nurse to have plaintiff come in to the office (Tr. at 637).  Plaintiff's disability lawyer had requested a letter from him regarding her disability.

On January 27, 2012, plaintiff saw Dr. Warbritton for muscle spasm in the back of her neck (Tr. at 635-636).  Dr. Warbritton assessed headache and performed osteopathic manipulative treatment.  He prescribed Norco (narcotic) for pain, 240 pills.

On February 9, 2012, Dr. Warbritton refilled plaintiff's Zanaflex, 180 pills with one refill (Tr. at 633-634, 697-698).

On February 14, 2012, plaintiff saw Dr. Warbritton for migraine headache (Tr. at 699-700).  He noted muscle spasm in the back of her neck, performed osteopathic manipulation, and refilled her medications.

On March 7, 2012, Dr. Warbritton refilled plaintiff's Cyclobenzaprine (muscle relaxer), 90 pills with one refill (Tr. at 632, 696).

On March 19, 2012, Dr. Warbritton refilled plaintiff's Norco (narcotic), 240 pills with one refill (Tr. at 631, 695).

On April 2, 2012, Dr. Warbritton refilled plaintiff's Ativan, 90 pills with one refill (Tr. at 630).

On April 29, 2012, plaintiff saw Dr. Warbritton and complained of a headache with nausea (Tr. at 691-692).  He noted muscle spasm in the back of her neck.  He performed osteopathic manipulation and gave her an injection of Toradol (non-steroidal anti-inflammatory).

On June 20, 2012, plaintiff had a CT scan of her head due to complaints of headaches (Tr. at 804, 834). The scan was normal. Radiologist Matthew Hrastich recommended an MRI if systems persist.

On June 21, 2012, Dr. Warbritton refilled plaintiff's Norco (narcotic), 240 pills with one refill (Tr. at 687, 830).

On June 25, 2012, plaintiff saw Dr. Warbritton and complained of headaches progressing to migraines (Tr. at 688-689, 831-832). She said the problem was getting worse. He noted muscle spasms in the back of her neck and assessed chronic headaches. He performed osteopathic manipulation and continued her same medications.

On July 3, 2012, Dr. Warbritton refilled plaintiff's Ativan, 90 pills with one refill (Tr. at 685, 829).

On August 29, 2012, Dr. Warbritton refilled plaintiff's Cyclobenzaprine with one refill (Tr. at 684, 827).

On September 4, 2012, Dr. Warbritton refilled plaintiff's Cyclobenzaprine (Tr. at 682, 825).

On September 10, 2012, Dr. Warbritton refilled plaintiff's Norco (narcotic), 240 pills with one refill (Tr. at 681, 824).

On September 28, 2012, Dr. Warbritton refilled plaintiff's Ativan, 90 pills with one refill (Tr. at 680, 823).

On November 29, 2012, plaintiff saw Dr. Warbritton for treatment of a headache associated with a sinus infection (Tr. at 820-821).

Case 2:14-cv-04128-REL   Document 20   Filed 05/29/15   Page 14 of 26

On December 5, 2012, Dr. Warbritton refilled plaintiff's Norco (narcotic), 240 pills with one refill (Tr. at 676, 819).

On December 21, 2012, Dr. Warbritton refilled plaintiff's Cyclobenzaprine, 60 pills (Tr. at 675, 818).

On February 1, 2013, plaintiff saw Dr. Warbritton (Tr. at 667-668, 849-850). She said she had been taking only half of her Ativan because she was having tremors in her hands and was too fatigued and sleepy. She was having additional anxiety due to the recent death[2] of her mother, and Dr. Warbritton told her the smaller dose was not enough.

On February 11, 2013, Dr. Warbritton refilled plaintiff's Lorazepam (also known by the brand name Ativan), 90 pills (Tr. at 665, 847-848).

On March 18, 2013, Dr. Warbritton refilled plaintiff's Norco (narcotic), 240 pills with one refill (Tr. at 663, 844).

On March 22, 2013, Dr. Warbritton refilled plaintiff's Lorazepam, 90 pills with one refill (Tr. at 661, 843).

On April 22, 2013, Dr. Warbritton completed a form entitled Headaches Medical Source Statement (Tr. at 812-815). He noted that he had been treating plaintiff for migraine headaches for 8 to 9 years. Plaintiff gets headaches 2 to 4 times per week

---

[2]Medical records dated less than a month earlier refer to plaintiff's mother being in a nursing home and having an emergency; therefore, the death of her mother was very recent (Tr. at 672). The ALJ noted that plaintiff testified at the hearing that she had not participated in counseling as Dr. Warbritton had recommended. It was in this February 1, 2013, record that he suggested counseling. This was the first time he had seen plaintiff since the death of her mother, and Dr. Warbritton specifically referred to plaintiff's increased anxiety as "situational."

and they last 2 to 3 hours.  She needs to take her medication and stay in a quiet, dark room until the pain subsides.  Therefore, plaintiff would need to take 2 to 3 breaks per week of 2 to 3 hours' duration if she were to work.  Her headache pain would cause her to be off task due to reduced attention and concentration more than 25% of the day on some days; other days she would not be affected.  He stated that she should not work around bright lights or loud noises, she should not lift anything heavy, and she should avoid temperature extremes.

## C.    SUMMARY OF TESTIMONY

During the May 1, 2013, hearing, plaintiff testified; and Denise Weaver, a vocational expert, testified at the request of the ALJ.

### 1.    Plaintiff's testimony.

At the time of the hearing plaintiff was 58  years of age and is currently 60 (Tr. at 36).  Plaintiff has applied for disability benefits three times (Tr. at 37). She last worked full time in 2000 and has had part-time jobs since then (Tr. at 37).  Plaintiff worked at Scholastic from September 2010 to April 2011 (Tr. at 38).  That was a part-time job and plaintiff took orders over the phone (Tr. at 60).  She had a difficult time doing the job because she had to wear headphones and there were constantly people talking, all of which worsened her headaches, but she needed the money (Tr. at 60).   She was supposed to work full time at Dollar General when she had that job, but it wound up being part time due to her headaches (Tr. at 61).  She had to quit because she kept having headaches and was also unable to pick up the heavy items when she was working at the cash register (Tr. at 61).

16

When plaintiff worked at Colonial Manor Apartments, she sat at a desk, had to get in a car and take potential residents to the apartments, and she did paperwork (Tr. at 66-67). Plaintiff did that job many years ago and now would not be able to make it up and down stairs to show the apartments (Tr. at 67).

Plaintiff's main issue is migraine headaches (Tr. at 38). Plaintiff has suffered from migraines for years, and they have gotten worse over time (Tr. at 38-39). In approximately 2009, her migraines began interfering with her ability to go to work and to perform her duties when at work (Tr. at 39).

Dr. Warbritton has been plaintiff's doctor for about 15 years (Tr. at 40). He has prescribed Topamax for plaintiff's migraine headaches (Tr. at 41). She uses it, but it does not do any good (Tr. at 41-42). Plaintiff has migraine headaches three or four times a week (Tr. at 42). The effects of a migraine stay with plaintiff the entire day because she is very weak after the migraine goes away (Tr. at 42). Plaintiff usually sits in her bed with a quilt over her head when she has a migraine (Tr. at 43). She takes prescription medication and over-the-counter medication when she gets a migraine (Tr. at 43). The migraine headache pain typically reaches a 9 out of 10 (Tr. at 56). When plaintiff's migraine pain reaches a 10 in intensity, she will go to the hospital (Tr. at 56). Her doctor does not keep narcotics in his office, so she is unable to get any immediate treatment from him (Tr. at 73-74). She has to pay a $150 co-pay every time she goes to the hospital, so she tries to suffer through the migraine pain at home with her medication if she can (Tr. at 57, 74).

Plaintiff lives with her husband, who is employed full time, and her 19-year-old daughter (Tr. at 44). When the daughter was younger, plaintiff had to keep her home from school a lot or the school would call and tell her to come get her daughter (Tr. at 59). Her daughter is mentally challenged and at 19 is still in school (Tr. at 58-59). She can be very unruly; and because of the care she required, plaintiff was not able to work full time when her daughter was younger (Tr. at 58-59).

On the days when plaintiff has a migraine, she cannot do anything (Tr. at 56). When plaintiff does not have a migraine headache, she feeds her dogs, does some laundry, talks on the phone, and vacuums (Tr. at 44). She lives in a small two-bedroom mobile home so it does not take long to clean it, but she has to sit down and rest often because of difficulty breathing (Tr. at 44). Plaintiff has emphysema but does not smoke anymore (Tr. at 44-45).

Plaintiff also suffers with anxiety for which she has been prescribed three or four medications (Tr. at 45-46). She has muscle spasms in her neck and back (Tr. at 48). She is unable to work in her flowerbeds anymore because of that pain (Tr. at 49). She takes three or four medications for her pain (Tr. at 52). Plaintiff takes medication for depression and does not have problems with depression as a result (Tr. at 51-52).

Plaintiff takes Hydrocodone three times every day (Tr. at 53-54). Her medications do not cause any known side effects (Tr. at 54).

**2.     Vocational expert testimony.**

Vocational expert Denise Weaver testified at the request of the Administrative Law Judge. The vocational expert testified that a person who needed two to three

breaks per week for two to three hours at a time would be unemployable (Tr. at 80-81, 88-89).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Carol Boorady entered her opinion on May 30, 2013 (Tr. at 14-23).  Although plaintiff alleged disability as of January 1, 2009, the ALJ found that disability cannot be established on her current applications prior to December 21, 2011.

> The claimant previously filed a Title II application for a period of disability and disability insurance benefits on November 8, 2011.  On that same date, she filed a Title XVI application for supplemental security income. Those applications were denied at the initial level on December 20,2011.  The claimant did not avail herself of her right to appeal that denial by requesting a hearing before an Administrative Law Judge.  A determination or decision made at any step of the administrative review process becomes final and binding if the claimant does not appeal timely.  The prior determination dated December 20, 2011, is final and binding because the claimant did not appeal it timely; therefore, disability cannot be established on the claimant's current applications prior to December 21, 2011, the day after the prior determination was issued.  This is an affirmation and I have not reopened the prior application.  However, because the claimant is requesting I reopen her prior application, I have fully considered all evidence of record when reaching the findings herein, including evidence from the previously determined period.

(Tr. at 14).

Plaintiff's last insured date was December 31, 2011 (Tr. at 15).

Step one.  Plaintiff has not engaged in substantial gainful activity since December 21, 2011 (Tr. at 16-17).  The work she performed after this date did not rise to the level of substantial gainful activity.

Step two.  Plaintiff has the following severe impairments:  degenerative joint disease of the lumbar spine, multilevel spondylosis, migraines, and chronic obstructive

pulmonary disease (Tr. at 17). Plaintiff's depression and anxiety are not severe because in her disability paperwork she alleged that virtually all of her limitations are due to her physical ailments, and her treatment records do not objectively document any notable problems with memory or nerves (Tr. at 17).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 17).

Step four. Plaintiff retains the residual functional capacity to perform sedentary work except that she needs to be able to stand for one or two minutes every half hour; can only occasionally climb ramps and stairs; can never climb ladders, ropes or scaffolds; can occasionally balance, stoop, kneel, crouch, or crawl; must avoid concentrated exposure to temperature extremes, loud noise, vibration, pulmonary irritants, and work hazards (Tr. at 17-18).

With this residual functional capacity, plaintiff can return to her past relevant work as a real estate clerk (Tr. at 22). Therefore, plaintiff is not disabled (Tr. at 23).

## VI.   OPINION OF PLAINTIFF'S TREATING PHYSICIAN

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of

examination; nature and extent of the treatment relationship; supportability, particularly

by medical signs and laboratory findings; consistency with the record as a whole; and

other factors, such as the amount of understanding of Social Security disability

programs and their evidentiary requirements or the extent to which an acceptable

medical source is familiar with the other information in the case record.  20 C.F.R. §§

404.1527, 416.927.

Dr. Warbritton treated plaintiff for migraine headaches for many years, and he

provided an opinion that plaintiff would need to take multiple breaks during the week

due to her symptoms.  The vocational expert testified that such a person cannot work.

Therefore, if Dr. Warbritton's opinion should have been given controlling weight, the

ALJ's opinion is not supported by substantial evidence.

The ALJ gave Dr. Warbritton's opinion only partial weight, finding that it was not

supported by objective medical signs or laboratory findings.

> [H]er headaches were an only intermittent complaint during her treatment
> sessions with Dr. Warbritton.  In fact, Dr. Warbritton did not prescribe any
> treatment for the claimant's reported migraines prior to the April 2013 treatment
> session wherein the claimant asked him to complete the Medical Source
> Statement.  Furthermore, the claimant's subjective complaints during that
> treatment session match Dr. Warbritton's Medical Source Statement, thereby
> indicating he relied almost exclusively upon the claimant's subjective complaints
> rather than any objective medical evidence when rendering his opinion.

(Tr. at 21-22).

Many times, claimants present to this court for review an opinion by an ALJ

which discredits the opinion of a treating physician on the ground that the physician's

opinion was based on statements by the claimant but is directly contradicted by the

treatment records. Such is not the case here. Although Dr. Warbritton indicated he wanted to talk to plaintiff when he completed the form, it is reasonable that he would need her input since the form requested information about how many hours a headache would normally last, and that is not something the doctor would know. In addition, his treatment records over a multi-year period completely corroborate the information in the Medical Source Statement.

The ALJ added the following with regard to plaintiff's headache treatment in the analysis of plaintiff's credibility:

> The claimant was diagnosed with migraine headaches in January 2009 and prescribed the use of Imitrex. That medication and later prescription Ativan, were effective at controlling her migraines until April 2010. During that month, the claimant sought an injection to relieve her headache pain. Despite subsequently ceasing to take prescription medications for her migraines, the claimant did not seek further treatment for that condition again until November 2010, when she again sought and received an injection [to] alleviate acute migraine pain. The claimant did not seek any regular care for her migraine headaches thereafter until being prescribed Topamax in April 2013, at which time she complained extensively of migraine headache pain and requested a Medical Source Statement from her treatment source regarding the same. In the interim period, the claimant only sought intermittent treatment for acute migraine pain, such as again seeking an injection in April 2012. In addition to her sporadic treatment regimen, the claimant has not presented with any medical signs commensurate with a serious, uncontrolled migraine condition (e.g., neurological deficits) and a computed tomography X-ray of the claimant's head was unremarkable. Although the claimant's treatment records support a finding that she does experience some migraine headaches that could reasonably contribute to the limitations described at Finding Five, they do not support a finding that she experiences intractable migraine headache pain several times per week that is not amenable to medication management.

> * * * * *

> . . . In addition to the routine, conservative nature of her treatment regimen, there are two other factors related to her treatment regimen that weigh against the credibility of her allegations. . . . [T]he record documents the claimant

22

engaging in some drug-seeking behavior. Specifically, there are repeated notations indicating the claimant was preoccupied with receiving powerful injections in lieu of other treatment options. Of particular note, after receiving injections in November 2010 for a migraine headache reportedly caused by a neck impairment, the claimant left her treatment provider, declining his offer to treat her purportedly underlying neck impairment. The cumulative evidence related to the claimant's treatment regimen establishes a pattern of seeking treatment that is not commensurate with her allegations regarding the seriousness of her conditions.

(Tr. at 20-21).

These findings by the ALJ are not supported by the record. I have outlined above plaintiff's treatment for migraine headaches which included regular prescriptions for narcotic pain medication, muscle relaxers, non-steroidal anti-inflammatories, and anti-anxiety medication. Although plaintiff's medications were obviously prescribed for more conditions than just headaches, the medical records make clear that Dr. Warbritton treated plaintiff's headaches by continually refilling these medications. I fail to see the pattern of treatment described by the ALJ. She found that plaintiff's migraines were controlled with Imitrex and Ativan from January 2009 through April 2010. However, there is no statement in any medical record that plaintiff's headaches were "controlled." Plaintiff had a CT scan in October 2008 because of headaches, and she was treated continuously through April 2013 for headaches. The ALJ's finding that plaintiff was on no headache medication from April 2010 through November 2010 is clearly disputed by the above summarized medical record showing an emergency room visit in April 2010 followed by regular doctor visits and medication refills for the remainder of 2010. The ALJ stated that plaintiff sought no medical care for headaches from November 2010 through April 2013; however, again, I fail to see how she could

Case 2:14-cv-04128-REL   Document 20   Filed 05/29/15   Page 23 of 26

come to such a conclusion given the medical record showing an emergency room visit in November 2010 followed by regular refills of her medications and doctor visits during the entire time cited by the ALJ. Dr. Warbritton routinely found that plaintiff's headaches were related to muscle spasms in the back of her neck; and medical visits during the years the ALJ found plaintiff sought no treatment clearly reflect complaints of, observations of, and treatment of muscle spasms in the back of plaintiff's neck.

The ALJ found that in April 2013, plaintiff "complained extensively of migraine headache pain and requested a Medical Source Statement from her treatment source". This is not entirely accurate. As the medical records reflect, plaintiff did not complain any more extensively in April 2013 about her headache pain than she had during the preceding years when the ALJ found plaintiff had not even sought treatment for them.

The ALJ's comments about plaintiff's drug-seeking behavior are likewise baffling. The injections plaintiff got in the emergency room for her headaches consisted, on all but one occasion, of a non-steroidal anti-inflammatory and nausea medication. She was regularly prescribed oral narcotic pain medication; therefore, seeking out an NSAID can hardly be considered drug-seeking behavior. In addition, the ALJ noted that "after receiving injections in November 2010 for a migraine headache reportedly caused by a neck impairment, the claimant left her treatment provider, declining his offer to treat her purportedly underlying neck impairment." On that occasion, plaintiff received an injection in the emergency room, and she left after the emergency room doctor recommended she follow up with her primary care physician for osteopathic manipulation for her neck condition.

24

The ALJ further discredited both plaintiff and Dr. Warbritton by pointing out that no neurological deficits were found on a CT scan of her head. However, there was no evidence before the ALJ that migraines must be caused by neurological deficits that would show up on a CT scan. The Mayo Clinic[3] has this to say about the causes of migraine headaches:

> Although much about the cause of migraines isn't understood, genetics and environmental factors appear to play a role. Migraines may be caused by changes in the brainstem and its interactions with the trigeminal nerve, a major pain pathway. Imbalances in brain chemicals -- including serotonin, which helps regulate pain in your nervous system -- also may be involved. Researchers continue to study the role of serotonin in migraines. Serotonin levels drop during migraine attacks. This may cause your trigeminal system to release substances called neuropeptides, which travel to your brain's outer covering (meninges). The result is headache pain.

There is no medical record in this case in which a doctor doubts the existence or severity of plaintiff's migraine headaches based on the results of a CT scan. There was no expert medical opinion before the ALJ which would provide a basis for her finding on this issue. See Nevland v. Apfel, 204 F.3d 853,858 (8th Cir. 2000) (an ALJ may not draw upon his own inferences from medical reports).

## VII.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole does not support the ALJ's finding that plaintiff is not disabled. There is no basis for discrediting the opinion of plaintiff's treating physician, Dr. Warbritton; and the

_____

[3]http://www.mayoclinic.org/diseases-conditions/migraine-headache/basics/causes/con-2 0026358

vocational expert testified that a person with the limitations listed in Dr. Warbritton's

Medical Source Statement would not be employable.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is granted.  It is further

ORDERED that the decision of the Commissioner is reversed and this case is

remanded for an award of benefits.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
May 29, 2015